# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
## Tampa Division

MARJORIE BONNETT,           )
                            )
    Plaintiff,             )   Case No. 8:04-cv-02507-SDM-TBM
vs.                         )
                            )
WYETH, INC., et al,         )
                            )
    Defendants.            )
                            )
                            )

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE "CAUSALITY ASSESSMENTS"

Wyeth protests most loudly about the evidence that most incriminates the company and most squarely undercuts its case theories. "Causality assessments" do both.

To be clear, "causality assessment" is a moniker of **Wyeth's** making, not Plaintiff's. "Causality assessment" is the name Wyeth and other pharmaceutical companies have attached to the procedure that clinical trial investigators use to assess the level of association between a study drug and a patient adverse event. Wyeth maintains a protocol entitled "Administrative Policy 405," which outlines the manner in which causality assessments are to be conducted.[1] In Wyeth's own words, a causality assessment is "an assessment of the likelihood that an [adverse event] is **causally related** to an investigational product."[2]

Wyeth's causality assessments are relevant on two fronts: (1) the very existence of a "causality assessment" protocol directly undercuts Wyeth's contention that no one can divine

---

[1] Ex 1, PX 1680 (Wyeth's Administrative Policy 405).

the cause of an individual woman's breast cancer; and (2) Wyeth causality assessments related specifically to E+P use and breast cancer are relevant to show that the company was on notice of the cancer risk of E+P (long before it adequately warned). Wyeth prepared causality assessments in conformity with detailed guidelines that mirror prevailing best practices for differential diagnosis and require its clinical investigators to review all of the patient's available medical information and consider alternate causes. This, of course, directly contradicts Wyeth's attacks on the specific causation methodology of Plaintiff's expert, Dr. Elizabeth Naftalis.[3]

Moreover, and contrary to Wyeth's protest, this evidence is in no way unfairly prejudicial. What would be unfair would be to exclude this evidence while Wyeth parades the courtroom throughout trial, making bold claims like "no one knows what causes breast cancer" and "even if E+P is a risk factor, there is no proof that it is a 'cause'." Wyeth's causality assessments belie Wyeth's trial narrative.

## **RELEVANT FACTUAL BACKGROUND**

Wyeth Policy 405 directs the clinical investigator conducting the causality assessment to consider five parameters: the "temporal relationship" between administration of the product and the adverse event; the "biological plausibility of relationship"; the patient's "underlying clinical state or concomitant agents/therapies"; whether, where applicable, the

---

[2]   *Id.* at 4 (emphasis added).
[3]   *See* Plaintiff's *Response in Opposition to Wyeth's Motion to Exclude the Specific Causation Testimony of Dr. Elizabeth Naftalis.*

adverse event abates when the patient discontinues use of the product; and whether, where applicable, the adverse event recurs upon repeat exposure to the product.[4]

Applying these criteria, Policy 405 directs the investigator to determine one of five degrees of relationship. An adverse event is "definitely related" if the investigator concludes that it "can be fully explained by administration of the investigational product."[5] It is "probably related" if it "is most likely to be explained by the administration of the investigational product, rather than the patient/subject's clinical state or other agents/therapies."[6] Wyeth has acknowledged that it collects and reviews randomly reported adverse events – which come to it from third parties during standard post-marketing surveillance – so that it can "know as much about the safety of its products as possible" and to "analyze for trends and associations."[7]

Wyeth physician Dr. Songlin Xue has testified that this process closely resembles a physician's diagnosis of a patient. A causality assessment "is a medical analysis for . . . all the information given to us."[8] This analysis involves, Dr. Xue continues, "the nature of the event, what occurred to this patient, what are other sources of the causes," including whether the "patient took other drugs, patient had some certain medical history, diabetes or epilepsy, whatever other medical information could be relevant to help me, as a physician, to say, what is the likelihood this event might have been related to this particular treatment of drug X."[9] Dr. Xue explains that this is "[j]ust like a patient walks to a doctor's office and presents with

---

[4] Ex. 1, at 5.
[5] Id. at 4.
[6] Id.
[7] Ex 2, PX 192 at 49-51.
[8] Ex 3, Depo. Tr., Songlin Xue, 6/8/2006, at 74-76.
[9] Id.

a headache. The doctor asks a whole bunch of questions very similar to this to try to sort out what really caused the headache."[10]

Wyeth's "causality assessment" analysis closely resembles the methodology performed by a physician conducting differential diagnosis to determine the cause of a patient's illness. Plaintiff's specific causation expert, Dr. Elizabeth Naftalis, explains that differential diagnosis "is a deductive reasoning process by which doctors assess the cause of a particular symptom, set of symptoms or illness based on the patient's particular clinical history."[11] Thus, it "allows for the physician to look at the possible explanations or causes for the patient's condition and then to assess which are more likely the cause and which are less likely or unlikely to be the cause."[12]

## ARGUMENT AND AUTHORITY

### I. WYETH'S CAUSALITY ASSESSMENTS ARE RELEVANT EVIDENCE OF NOTICE.

Wyeth's internal causality assessments are one of several red flags that should have alerted the company to the need to study the relationship between E+P drugs and breast cancer.

Causality assessments from Wyeth's own clinical trials identified a possible relationship between individual women's breast cancers and their use of E+P. Even in its short-term studies looking for other benefits, Wyeth found that some women developed breast cancer that may have been caused by the drugs.[13] But even though Wyeth included specific information about its short-term study in the Prempro label, it never warned doctors

---

[10] *Id.*
[11] Ex 4, Expert Report of Dr. Naftalis.

4

that one of its own investigators had found that E+P therapy may cause breast cancer after less than a year's use.

Wyeth's internal causality assessments show what Wyeth knew, or should have known, about the dangers of its E+P drug – a danger it did not communicate to Plaintiff or her physicians, who relied on Wyeth's warnings. Wyeth now admits that "HT is a risk factor for breast cancer."[14] Causality assessments will show when it should have known what it now calls "an undisputed fact."[15]

Furthermore, while Wyeth relies on the order in *Torkie-Tork v. Wyeth*,[16] that order, in fact, ruled that "causality assessments" **are** admissible "insofar as causality assessments are probative of defendant's level of knowledge as to the risks of breast cancer for those taking Prempro."[17] Accordingly, the court continued, "such evidence is relevant and its probative value is not substantially outweighed by its prejudicial effect under Rule 403."[18] Because notice to Wyeth of the risks of E+P is critical to its liability for failure to warn, and because the causality assessments show what Wyeth knew or should have known, this Court should not exclude them.

## II. WYETH'S CAUSALITY ASSESSMENTS ARE RELEVANT TO REFUTE WYETH'S SPECIFIC CAUSATION DEFENSE AND BUTTRESS PLAINTIFF'S EXPERT'S METHODOLOGY.

Wyeth's defense to specific causation, in this and other HT cases, is to deny that any such thing exists: it insists in case after case that there is no reliable way to assess whether

---

[12] *Id.*
[13] Ex 5, PX 285 at 26 (Pt. # 30155-019).
[14] *See* Wyeth's Mot., at 8.
[15] *Id.*
[16] Ex 6, Order in *Torkie-Tork v. Wyeth*.
[17] *Id.* at ¶ c.

E+P caused breast cancer in any individual woman. Policy 405, and the E+P/breast cancer causality assessments conducted under that policy, belie that notion by showing that even Wyeth agrees, at least in theory, with the unremarkable proposition that it is possible to link an individual's cancer to her use of a dangerous drug.

Wyeth itself gives the causality assessment its name, and defines it as "an assessment of the likelihood that an [adverse event] is **causally related** to an investigational product."[19] And the methodology Wyeth's own physicians employ in conducting causality assessments mirrors the differential diagnosis employed by Plaintiff's specific causation expert, Dr. Naftalis, to opine on specific causation in cases like this one. Wyeth physician Songlin Xue has explained that an investigator conducting a causality assessment begins by evaluating and eliminating other factors that could have caused the patient's illness, in order to determine "the likelihood that this event might have been related to this particular treatment of drug X."[20] This process is "[j]ust like a patient who walks to a doctor's office and presents with a headache. The doctor asks a whole bunch of questions very similar to this to try to sort out what really caused the headache."[21]

Dr. Naftalis employed the same technique to opine on specific causation, utilizing "a process by which doctors assess the cause of a particular symptom, set of symptoms or illness based on the patient's particular clinical history."[22] Doing so, physicians can "look at

---

[18]   *Id.*
[19]   Ex. 1, at 4 (emphasis added).
[20]   Ex. 3.
[21]   *Id.*
[22]   Ex. 4, at 21.

6

the possible explanations or causes for the patient's condition and then . . . assess which are more likely the cause and which are less likely or unlikely to be the cause."[23]

Indeed, Policy 405 itself demands that investigators apply the same criteria as the legally-approved Bradford-Hill differential-diagnosis model, examining:

- Temporal relationship between administration of the investigational product and the adverse event;
- Biological plausibility of the relationship;
- Subjects' underlying clinical state or concomitant agents/therapies;
- Where applicable, whether the event abates on discontinuation of the investigational product (dechallenge); and
- Where applicable, whether the event reappears on repeat exposure to the investigational challenge (rechallenge).[24]

Policy 405 then requires Wyeth investigators to assess the degree of relationship between the Wyeth product and the adverse outcome. Each degree of relationship is precisely defined; for example, an event is "probably related" if it is "most likely to be explained by administration of the investigational product, rather than the patient/subject's clinical state or other agents/therapies."[25]

Wyeth has acknowledged that it collects and reviews randomly-reported events in order to "know as much about the safety of its products as possible."[26] But having admitted, belatedly, that E+P carries a breast cancer risk, and having instructed its own investigators to evaluate the relationship between its E+P product and breast cancer, Wyeth nevertheless insists in this litigation and others that no method can prove that a particular patient's disease has a particular cause. Its attempt to distinguish the circumstances under which it ***applies*** the

---

[23] *Id.*
[24] Ex. 1, at 5.
[25] *Id.* at 4.
[26] Ex. 2.

7

same differential-diagnosis methods that Plaintiff and other HT plaintiffs use to show specific causation has nothing to do with the *validity* of the methods themselves.  It does not matter, for example, that Wyeth investigators work under time constraints or with less information than is available to Dr. Naftalis.  What matters is that Dr. Naftalis employs methods that Wyeth itself accepts. Moreover, the causality assessments show that it is possible to link use of E+P drugs to individual cases of breast cancer – a fact Wyeth continues to deny – and that Wyeth itself does just that.  Because causality assessments rebut Wyeth's generic denial that specific causation can ever be proved, they are admissible.

### III.     WYETH'S "CAUSATION" ARGUMENT MISSES THE MARK.

Wyeth cites to a string of cases[27] for the uncontroversial position that a plaintiff in a pharmaceutical case cannot prove general causation by resort to causality assessments. Wyeth's argument confuses the issue.

As explained elsewhere in her briefing, Plaintiff has a mountain of universally accepted medical and scientific evidence to prove general causation (*i.e.*, that E+P causes breast cancer, generally).  And there is a clear consensus that E+P causes breast cancer by way of "promotion." She has no intention of offering any causality assessment report for the purpose of proving up general causation.  Instead, again, she intends to offer causality assessments for two discrete purposes – proving notice and proving viable, accepted methodology – both of which are contested by Wyeth.

Furthermore, the court's holding in *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp.2d 434 (W.D. Pa. 2003),[28] is particularly instructive here.  Although Wyeth cites *Soldo* to

8

support its position, in fact, there are a litany of reasons that the case cuts against it.  First, in *Soldo,* as with the other cases cited by Wyeth and unlike the instant case, the plaintiff's expert was attempting to rely solely on causality assessments to prove up causation.  Furthermore, and importantly, the plaintiff's expert was not aware of the methodology employed by the company in performing the causality assessments because the methodology was not adequately described anywhere. *Id.* at 464.  Here, in contrast, Wyeth has specific written protocols used by its safety physicians and investigators.  And in *Soldo*, the causality assessments were not even performed by the defendant drug company.  *Id.*  Here, Wyeth wrote the methodology, Wyeth's doctors implemented the methods, and the patients were enrolled in Wyeth's own clinical trials.[29]

Additionally, the injury suffered by the plaintiff in *Soldo* was not the injury that had been "causality assessed," *id.* at 464-65, whereas, here, Wyeth's causality assessments involve the very injury at issue: breast cancer in postmenopausal women taking E+P drugs.  In *Soldo*, the court expressed concern as to the quality and availability of the information upon which the causality assessments were based.  But here, the causality assessments are from Wyeth's own clinical trials where Wyeth had access to full medical information important to each patient. Lastly, in *Soldo,* the court was concerned that the company's methodology was not generally accepted in the medical and scientific communities.  *Id.* at 465.  Here, Wyeth's manual is based upon the protocols and procedures required by the Food

---

[27]  *See* Wyeth Mot., at 6.
[28]  Id.
[29]  As an aside, Wyeth's motion makes no mention of the causality assessment protocol used by Plaintiff's oncologist, Dr. Otoya, during his days as a clinical investigator (which was marked and shown to him at his deposition).  Although that protocol was for another HT defendant not named in the instant case (*i.e.*, Pharmacia

& Drug Administration for evaluating adverse events (including cancer)[30] and peer review published papers validate the methodology. Wyeth's causality assessments do not reflect the subjective opinions of random external reporters, but rather the reasoned assessments of its safety physicians and investigators.

Wyeth also points to cases[31] that disfavor admissibility of single causality assessments, like single case reports, to prove causation. Again, Plaintiff does not seek to admit causality assessments here to establish causation but instead, to support the viability of her expert's methodology. Furthermore, Plaintiff has evidence of more than 50 causality assessments from Wyeth's clinical trials.[32]

Perhaps most importantly, Wyeth ignores the plethora of cases supporting the admission of causality assessments for all purposes, including as evidence of causation. *See McCarrell v. Hoffman-La Roche, Inc.,* 2009 WL 614484, at *28-29 (N.J. Super. Ct.) (unpublished); *see also In re Phenylpropanolamine Prods. Liab. Litig.,* 289 F. Supp. 2d 1230, 1248 (W.D. Wash. 2003) (allowing admission of case and ADR reports, textbooks, treatises, and testimony from other experts and scientists); *Glaser v. Thompson Med. Co.,* 32 F.3d 969, 972 (6th Cir. 1994) (holding that published studies, published articles, case reports, and the expert's own clinical and research experience constituted sufficient reliable scientific data upon which an expert may base conclusion).

---

& Upjohn), the protocol is nonetheless admissible to the extent that Wyeth continues to challenge Plaintiff's specific causation methodology at trial.

[30] Ex. 7, PX 8031 at 8 (Drug companies must report all serious adverse events including cancers that develop after years of therapy.).

[31] *See* Wyeth Mot., at 6 (citing *e.g., Glastetter v. Novartis Pharms. Corp.*, 107 F. Supp. 2d 1015 (E.D. Mo. 2000)).

[32] Ex. 8, Trial Tr., *Henry / Buxton v. Wyeth*, Aug. 4, 2010 AM at 55:20—56:4.

The Fourth Circuit's treatment of this issue in *Benedi v. McNeil-P.P.C, Inc.*, 66 F.3d 1378, 1385-86 (4th Cir. 1995), is instructive. In *Benedi,* the court approved the admission of drug event reports and case summaries that were not even generated by the defendants' physicians (as here), but rather, were simply randomly reported to the company from third parties. The court noted that any dissimilarities between the plaintiff's situation and those described in the reports went to the weight the jury should give the evidence. *Id.* at 1387. The court found that these case reports "could even give rise to a duty to warn." *Id.* Since the defendant was "free to, and did, offer testimony rebutting the significance of these reports," admission was appropriate. *Id.* at 1386. The reliability of the causality assessments here far surpasses that of the documents that were permitted in *Benedi.*

The New Jersey state court's treatment of causality assessments in *McCarrell v. Hoffman-La Roche, Inc.,* 2009 WL 614484 (N.J. Super. Ct. Mar. 12, 2009), is also instructive. In *McCarrell*, the court affirmed admission of causality assessments as reliable and based on well-established scientific criteria, in circumstances virtually identical to the protocols used by Wyeth in this case. *Id.* The court distinguished *Soldo* and *Glastetter*, on which Wyeth relies here, for the very reasons discussed above:

> We find the case at bar distinguishable from other cases concluding that an expert had improperly relied upon causality assessments. *See,e.g., Soldo v. Sandoz Pharms. Corp.,* 244 F. Supp. 2d 434, 465 (W.D. Pa. 2003) (plaintiff did not show, or even argue, that the regulatory "causality assessment" methodology is accepted in medical or scientific fields for establishing medical causation); *Glastetter, supra* 107 F. Supp. 2d at 1037 (wherein a causality assessment involving only one individual was held insufficient to establish causation).

*McCarrell*, 2009 WL at *29.

11

### IV. THERE IS NO RISK THAT WYETH'S CAUSALITY ASSESSMENTS WILL CONFUSE THE JURY.

Again, Wyeth's causality assessments will inform the jury on two points: notice and methodology. Their significant probative value is in no way "substantially" outweighed by the danger of unfair prejudice. *See* FED. R. EV. 403 (permitting exclusion of otherwise admissible evidence only if "its probative value is **substantially outweighed** by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue prejudice, waste of time, or needless presentation of cumulative evidence."

Indeed, exclusion under Rule 403 is "an extraordinary remedy which should be used sparingly." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (internal citations omitted). And even in those rare circumstances where it may be appropriate to apply Rule 403, "the federal rules favor admission of evidence over exclusion," because the rule "permits a trial court to exclude concededly probative evidence." *Id.*

Those circumstances do not exist here. Wyeth relies entirely on the *Accutane* order, *In re Accutane Prods. Liab.*, 2007 WL 1288354 (M.D. Fla. May 2, 2007), for its argument that Rule 403 bars its causality assessments, but the comparison fails. The assessments themselves in *Accutane* were dramatically different and had been offered primarily for a purpose – to prove causation – that the court found impermissible and that is not at issue here. The internal assessment methods in *Accutane* were so watered-down that the entire assessment was reduced to a "yes/no" question that relied almost entirely on the assessment of the third party who reported the adverse event to the company. *Id.* at *2. The external "reporter," the *Accutane* court noted, could be anyone from a doctor, to a patient, to the plaintiff's own lawyer. *Id.* at *3. If any reporter assessed the adverse event as "related" or

12

"unknown," the company automatically assessed the event as "related" even if its internal scoring system found no causal relationship. *Id.* at *2. Thus, unlike here, where the causality assessments reflect the results of Wyeth's internal investigation, the *Accutane* court found that the assessments in that case reflected not the subjective beliefs of the defendant company, but rather those of the third-party reporters of adverse events. *Id.* at *4.

The causality assessments in *Accutane* had little or no probative value because they did not reflect the company's own assessments – they simply recorded statements from third parties, based on whatever thought process led those third parties to believe what they said. Here, on the other hand, Wyeth investigators applied Policy 405 to ensure a rigorous internal review. The results of those reviews, therefore, prove that Wyeth had subjective knowledge of the risks of its E+P drugs because it studied and established the link to adverse events itself. Likewise, the reports here, unlike the ones in *Accutane*, reflect Wyeth's acceptance of the general principle that specific causation is provable by differential diagnosis. Because the causality assessments in this case have substantial probative value and minimal risk of undue prejudice, they are admissible.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Honorable Court deny Wyeth's Motion *In Limine* to exclude evidence of causality assessments.

Dated this 10th day of April, 2012.

        Respectfully Submitted,

        ALLEY, CLARK, & GREIWE
        701 E. Washington Street / P. O. Box 3127
        Tampa, Florida 33601-3127
        (813) 222-0977 Tele. / (813) 224-0373 Fax
        Attorneys for Plaintiff

By: /s/ James D. Clark
        **JAMES D. CLARK, Esq.**
        Fla. Bar No. 191311
        E-Mail: *jclark@tampatriallawyers.com*

**CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that on this 10th day of April, 2012, a true and correct copy of the foregoing has been forwarded to all counsel via facsimile, United States Mail, electronic mail and/or via the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel.

                              ALLEY, CLARK, & GREIWE
                              701 E. Washington Street
                              P. O. Box 3127
                              Tampa, Florida 33601-3127
                              (813) 222-0977 Tele. / (813) 224-0373 Fax
                              Attorneys for Plaintiff


By: /s/ James D. Clark
                **JAMES D. CLARK, Esq.**
                Florida Bar No. 191311
                E-Mail: *jclark@tampatriallawyers.com*